UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GARY HALE,

          Plaintiff,

vs.

CORRECTIONAL MEDICAL SERVICES,
INC., *et al.*,

          Defendants.
                                  /

Case No. 1:10-cv-1008

Hon. Robert J. Jonker

**REPORT AND RECOMMENDATION**

       This is a civil rights action brought by a prisoner incarcerated by the Michigan Department of Corrections (MDOC) pursuant to 42 U.S.C. § 1983.  This matter is now before the court on plaintiff's motion for leave to file a third amended complaint (docket no. 42), defendant Margaret Ouellette and Dr. Raymond Gelabert's motion for summary judgment (docket no. 43), and defendant Syed Sohail's motion for summary judgment (docket no. 46).

       **I.**     **Background**

       Plaintiff's second amended complaint names three defendants: PA Margaret Ouellette; Dr. Syed Sohail; and Dr. Raymond Gelabert.  Plaintiff seeks relief against defendants for acts which occurred at either the Florence Crane Correctional Facility (ACF) or the Lakeland Correctional Facility (LCF) prior to the filing of his original complaint on October 13, 2010.  While plaintiff's second amended complaint refers to violations of the Fifth, Eighth, Ninth and Fourteenth Amendments, his claims are limited to four instances of alleged inadequate medical care.  First, plaintiff alleged that he was denied an "anterior throat operation."  Second Amend. Compl. at p. 3-A (docket no. 9).  Second, plaintiff has suffered from cartilage and ligament "repair and spurring

removal of the right knee area." *Id.* Third, plaintiff has suffered from "intense and debilitating pain" since 1994. *Id.* Fourth, defendants have limited the use of his wheelchair. *Id.*

## II. Motions for summary judgment

### A. Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 further provides that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by":

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in deciding a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, the court is

not bound to blindly adopt a non-moving party's version of the facts. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### B. Eighth Amendment claim[1]

Plaintiff seeks relief pursuant to 42 U.S.C. § 1983, which confers a private federal right of action against any person who, acting under color of state law, deprives an individual of any right, privilege or immunity secured by the Constitution or federal laws. *Burnett v. Grattan*, 468 U.S. 42, 45 n. 2 (1984); *Stack v. Killian*, 96 F.3d 159, 161 (6th Cir.1996). To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

It is well established that an inmate has a cause of action under § l983 against prison officials for "deliberate indifference" to his serious medical needs, since the same constitutes cruel and unusual punishment proscribed by the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97 (l976). A viable Eighth Amendment claim consists of an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A court considering a prisoner's Eighth Amendment claim must ask both if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation and if the officials acted with a sufficiently culpable state of mind. *Hudson v. McMillian*, 503 U.S. 1, 8 (1992).

---

[1] While plaintiff's second amended complaint stated that defendants violated his rights under the Fifth, Ninth and Fourteenth Amendments, all of his claims relate to alleged deliberate indifference to a serious medical need. Accordingly, the court will treat his claims as arising under the Eighth Amendment.

3

The objective component requires the infliction of serious pain or failure to treat a serious medical condition. *Hudson*, 503 U.S. at 8-9. With respect to the infliction of serious pain, courts recognize that "[b]ecause routine discomfort is part of the penalty that criminal offenders pay for their offenses against society, only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Id.* at 8 (internal citations and quotation marks omitted). Similarly, "[b]ecause society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Id.* at 9.

The subjective component requires that the defendant act with deliberate indifference to an inmate's health or safety. *See Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991). To establish the subjective component, the plaintiff must show that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Mere negligence in diagnosing or treating a medical condition does not constitute an Eighth Amendment violation. *Id.* at 835. The conduct for which Eighth Amendment liability attaches must be more than negligence, "it must demonstrate deliberateness tantamount to an intent to punish." *Molton v. City of Cleveland*, 839 F.2d 240, 243 (6th Cir. 1988) (internal citation omitted). "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishment Clause." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

### B.     The throat surgery

### 1.     Contrary to plaintiff's claims, throat surgery was not recommended

Plaintiff's claim that defendants denied him throat surgery arises from correspondence which was generated in 1994, more than 16 years before he filed this action. On January 8, 1994, two other physicians at the University of Michigan Medical Center, Department of Neurosurgery (James Hohut, M.D., Resident Neurosurgeon, and William F. Chandler, M.D., Professor of Neurosurgery) advised prison officials of their examination of plaintiff, a 47-year-old prisoner who had undergone a C3-C7 posterior cervical laminectomy in 1990 for compressive cervical myelopathy. Neurosurgery Letter (Jan. 8, 1994) (docket no. 55-6 at p. 3). The letter concluded:

> In summary, Mr. Hale has basically unchanged physical exam. He does have some subjective reports of weakness, but this cervical myelogram and his flexion extension views show no significant changes or significant neural element compression. **Accordingly, we recommend physical therapy and no surgical intervention at this time**. We will see him again on a p.r.n. basis should new symptoms develop.

*Id.* (emphasis added).

Another letter, dated January 10, 1994, was generated by the Department of Neurosurgery (co-authored by Gary Colon, M.D., Resident Neurosurgeon, and Julian T. Hoff, M.D., Professor of Neurosurgery). *See* Neurosurgery Letter (Jan. 10, 1994) (docket no. 55-3 at p. 8). This letter refers to plaintiff's condition after undergoing the C3-C7 posterior cervical laminectomy in 1990 and plaintiff's reported deterioration in his condition since the surgery. *Id.* The letter notes that an MRI from March 1993 showed "what appears to be improved anterior cervical osteophytic disease at C3-4 and C4-5 levels." *Id.* The letter continued:

> I am unsure what to make out of this most recent MRI which appears somewhat improved from his previous MRI here in April of 1991, at the University of Michigan. Because I am concerned with his continuing myelopathy by his report, we will obtain a cervical myelopathy as an outpatient on 1/27/94, and the patient will return 1-2 weeks after that time with C-sine flexion extension views to make sure there is no instability in his cervical spine. **If there is indeed significant cord impingement or places where the dye is unable to get around an anterior osteophyte, we will consider surgical intervention**. If this is not the case the we should consider a comprehensive 8-12 week physical therapy program.

*Id.* (emphasis added).

Finally, a letter dated July 13, 1995 from the Department of Neurosurgery (co-authored by Sanjay Gupta, M.D., Resident Neurosurgeon, and Lawrence D. Dickinson, M.D., Assistant Professor of Neurosurgery), did not reference any need for surgery. *See* Neurosurgery Letter (docket no. 55-6 at p. 5). Rather, this report determined that plaintiff was stable and had no restrictions:

> In summary, Mr. Hale continues to have some subjective complaints of weakness. He has had these complaints for quite some time since the operation, and his imaging studies have continued to find no new lesion. His exam is stable. We will see him back in the clinic only on an as-needed basis. He has a stable neurological deficit. He should have no restrictions on his activity.

*Id.*

While plaintiff relies on the January 10, 1994 letter as establishing his need for surgery, his reliance is unfounded because this letter does not recommend surgery. Rather, the physicians would consider surgical intervention under certain circumstances with an alternative course of action being 8-12 weeks of physical therapy. Given that there was never a recommendation for surgery in 1994, and that the neurosurgeons found him stable with no new lesions and no restrictions on his activity in 1995, plaintiff's claim that defendants were deliberately indifferent to his serious medical needs for failing to perform surgery, is meritless.

6

### 2. PA Ouellette

In support of her motion, PA Ouellette has submitted an 82-paragraph declaration setting forth in detail her treatment of plaintiff's alleged ailments at ACF from January 1, 2009 until plaintiff's transfer out of ACF on April 8, 2011. *See* Ouellette Declaration (docket no. 43-2). For purposes of this motion, the court will consider plaintiff's treatment through October 13, 2010, the date he filed this action. In her declaration, PA Ouellette summarized plaintiff's medical history as follows: he is legally blind and morbidly obese; ambulates with either a walker or wheelchair; he has a history of diabetes mellitus II, hyperglycerdemia, hypertension, osteoarthritis, and spondylosis; and he has a history of poor compliance with diabetes care "because he eats improperly, refuses regular testing of his blood sugar, and refuses medication." Ouellette Declaration at ¶ 4; MDOC Medical Records at pp. 98, 99, 141, 196 and 201 (docket no. 45-1). For example, non-party PA Heebsch noted at an examination on February 11, 2009: that plaintiff was not compliant with dietary guidelines, stating that he eats "whatever I want," knowing that some of the food he is buying is full of sugar and salt which he is supposed to avoid; that plaintiff is not compliant with exercise; and that plaintiff was not adhering to his medical contract/goals. MDOC Medical Records at p. 141. Plaintiff's record also includes a MDOC "Release of responsibility for endocrine care clinic" from June 22, 2009, which noted: that plaintiff declined treatment to control his blood sugar; that he refused to participated in periodic laboratory monitoring despite advice that failure to control his blood sugar could result in major complications such as blindness, kidney failure, gangrene, amputations, painful peripheral neuropathy, coronary artery disease, myocardial infarction and death. *Id.* at p. 201.

With respect to plaintiff's neck problem, the record reflects that PA Ouellette saw plaintiff on April 29, 2010 and ordered an x-ray examination of the cervical spine, four views, to determine the source of his chronic neck pain. Ouellette Decl. at ¶ 51; MDOC Medical Records at pp. 412. The x-rays were performed on April 30, 2010 and revealed degenerative spurring, but the disc spaces were preserved, with no evidence of fracture and no osteolytic or blastic changes. Ouellette Decl. at ¶ 52; MDOC Medical Records at p. 57. PA Ouellette reviewed the x-rays on May 4, 2010. *Id.* On May 12, 2010, PA Ouellette met with plaintiff to review his x-rays. Ouellette Decl. at ¶ 53. PA Ouellette summarized this meeting as follows:

> On May 12, 2010, I saw the patient with the Health Unit Manager. The patient told the HUM that he has spurs and herniations in his neck. The patient also reported that the spinal fluid was not circulating around the spinal cord in his cervical spine, as revealed in his last myelogram in January of 1994. The patient reported that he was referred to physical therapy in 1994 and was evaluated twice. He thinks he had surgery in 2001. We reviewed his prior x-rays of the cervical spine. The first, in 2001, showed mild arthritic changes with anterior spondylosis of the C2-C5. The second, on December 14, 2006, showed mild degenerative change with anterior spondylosis with mild joint space narrowing of the C4-C5 consistent with degenerative disc disease. The third, on January 30, 2010, was limited, but the most recent, April 30, 2010, showed degenerative spurring, but the disc spaces appear preserved with no evidence of fracture, no osteolytic or osteoblastic changes. Patient reported that his spinal cord was partially crushed and that he had a spinal laminectomy in November of 1990. The patient reported electrical sensation with every movement. Based on this, the patient did not need surgery to "complete" any prior surgery, repair any herniations (he has none), or remove spurs. However, to address the pain, the patient was offered the medication, Tagretol, which is effective for neuralgia, pain from damaged nerves. The patient refused the Tagretol.

*Id.* (internal citation omitted).

In his responsive affidavit, plaintiff stated that he needed neck surgery and that he suffered pain due to his neck. Gary Hale Aff. at ¶¶ 1-5 (docket no. 55-3). According to plaintiff, in November 2008, PA Ouellette stated that she would "discuss the issue later." *Id.* at ¶ 5. Plaintiff states that he saw Ouellette about one month later, showed her copies of the University of Michigan

8

recommendation from 1994 which according to plaintiff "support[ed] my claim that I need anterior frontal throat operation to remove spurs with fusion." *Id.* at ¶ 7.  According to plaintiff, PA Ouellette gave him a physical examination, told him that "she saw no need for the operation" and that "we don't do things that way." *Id.*  Plaintiff stated that every time he saw Ouellette he talked to her about his "need for neck surgery." *Id.* at ¶ 8.  However, Ouellette "always blew it off, would not talk about it," told plaintiff that "it was not going to happen" and that "it costs too much," and she would "yell & scream and order me out of her office." *Id.*  Plaintiff asked her to request the surgery but "that was never done." *Id.*  Plaintiff takes the position that his medical problems (i.e., his need for a walker or wheelchair, severe neck pain, eye sight problem, ear damage and urinary problems) "are caused by the neck sprine [sic] & need for surgery." *Id.* at ¶ 10.  According to plaintiff, PA Ouellette "wants to blame all my problems on diabetic [sic], but I had these problems many years before I got diabeties [sci]." *Id.* at ¶ 11.

While plaintiff's affidavit contains statements that PA Ouellette refused to treat his neck injury since November 2008, these conclusory assertions fail to present a genuine issue of material fact with respect to his deliberate indifference claim against defendants.  PA Ouellette obtained current x-rays, evaluated plaintiff's neck problem, and met with plaintiff in May 2010 to address his demand for neck surgery.  The Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Westlake v. Lucas*, 537 F.2d 857, 860 n. 5 (6th Cir. 1976).  This action falls in the latter category.  "Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law."

*Id. See Owens v. Hutchinson*, 79 Fed. Appx. 159, 161 (6th Cir. 2003) ("[a] patient's disagreement with his physicians over the proper medical treatment alleges no more than a medical malpractice claim, which is a tort actionable in state court, but is not cognizable as a federal constitutional claim"). *See also*, *Woodberry v. Simmons*, 146 Fed.Appx. 976, 977 (10th Cir. 2005) ("a difference of opinion between a prisoner and the prison medical staff about medical treatment does not constitute deliberate indifference"). Accordingly, PA Ouellette is entitled to summary judgment as to this claim.

### 3. Dr. Gelabert and Dr. Sohail

Plaintiff does not set forth particular allegations regarding either defendant Dr. Gelabert or Dr. Sohail with respect to his neck condition. In opposing the motion for summary judgment, plaintiff stated in an affidavit that "[e]very time I saw Dr. Gelabert I tried to get held for my need for an anterior frontal throat operation", "I never received any help [from the doctor]", and that "[t]his is a serious medical need that is being totally ignored." Plaintiff's Aff. at ¶ 5 (docket no. 55-4).

As an initial matter, the medical record does not reflect that either Dr. Gelabert or Dr. Sohail was involved in evaluating plaintiff's need for the requested surgery. *See* Ouellette Decl.; Dr. Gelabert Affidavit (docket no. 43-3 with attached medical records at docket nos. 45-1 through 45-4). Rather, the medical records reflect that PA Ouellette addressed plaintiff's request for surgery on May 10, 2010. With respect to Dr. Sohail, he did not begin treating plaintiff until May 17, 2010, five days after plaintiff met with PA Ouellette to discuss the surgery. Dr. Sohail Decl. at ¶ 5 (docket no. 47-1 with attached medical records at docket no.47-2). There is no evidence that either Dr.

Gelabert or Dr. Sohail were involved in denying this request. Dr. Gelabert and Dr. Sohail are entitled to summary judgment on this claim.

### C. Repair of plaintiff's right knee

Contrary to plaintiff's allegations, the record reflects that he received extensive treatment for his right knee. On August 9, 2010, plaintiff reported pain in the right knee cap. Ouellette Decl. at ¶ 60. PA Ouellette examined plaintiff on August 17, 2010, at which time plaintiff reported that the onset of his knee pain was *36 years ago*, and that his pain level was 7 out of 10. Oullette Decl. at ¶ 60; MDOC Medical Records at pp. 467-68. Plaintiff wanted to be examined by an orthopedic surgeon for an MRI. *Id.* PA Ouellette noted that the right knee appeared larger than the left, was tender to palpitation and had limited range of motion. *Id.* PA Ouellette spoke with Dr. Gelabert about an orthopedic referral. *Id.*

Dr. Gelabert examined plaintiff on September 13, 2010. Gelabert Aff. at ¶ 9; MDOC Medical Records at pp. 469, 471-74. At that time, the doctor noted that plaintiff's right knee was larger than his left knee and that the range of motion was limited by approximately 85%. *Id.* Dr. Gelabert also noted that plaintiff had a previous x-ray of the knee in February 2007, which showed degenerative changes and retro patella spurring. *Id.* The doctor wanted to rule out condromalacia patella (i.e., damage to the cartilage under the knee cap). *Id.* Based on this examination, Dr. Gelabert ordered an x-ray of the knee, three views, to assess the current status, provided him with a wheelchair detail and an Elavil prescription to help with pain management. *Id.* Plaintiff, however, refused the prescription for pain medication. *Id.* The doctor did not find an orthopedic referral justified due to plaintiff's osteoarthritis. *Id.*

The right knee x-rays were performed four days later on September 17, 2010. Gelabert Aff. at ¶ 10. The x-rays showed mild to moderate degenerative changes, mild to moderate joint space narrowing and spur formation. *Id.* However, there was no evidence of fracture, dislocation, osteoblastic or osteolytic activity, and the soft tissue structures were unremarkable. *Id.* On September 22, 2010 Dr. Gelabert followed up with plaintiff regarding a wheelchair, explaining that plaintiff would have the wheelchair accommodation as long as he was unable to use the walker, but that he must keep the walker and try to use it as much as possible. Gelabert Aff. at ¶ 13; MDOC Medical Records at p. 484.

On September 30, 2010, Dr. Gelabert again saw plaintiff regarding his right knee problem. The doctor summarized this meeting as follows:

> On September 30, 2010, I followed up with the patient regarding diagnostic testing. The patient was bound to his wheelchair and states that it is very difficult for him to walk secondary to chronic cervical and thoracic spondylosis. [MDOC Medical Records] at 491. I discussed the most current knee x-rays with the patient which showed mild to moderate degenerative changes. The patient wanted knee surgery. I explained that he was not a candidate for reconstructive surgery in my medical judgment. Due to chronic cervical and thoratic lumbar spondylosis and chronic pain, it would be uncertain that he could walk even with knee replacement surgery. <u>Id.</u> at 490-91. The knee replacement surgery would be risky with a significant likelihood of bad outcome due to his poor health. I ordered the patient Mobic (a medication for the pain associated with osteoarthritis) and Lotrimin to treat a rash on his chin. I stopped the Tylenol. <u>Id.</u> at 488.

Gelabert Aff. at ¶ 14.

Based on this record, both PA Ouellette and Dr. Gelabert evaluated and treated plaintiff's complaint regarding his right knee cap. While plaintiff disagreed with that evaluation, and wanted some type of reconstructive surgery, his disagreement with a course of treatment does not establish deliberate indifference. *See Westlake*, 537 F.2d at 860 n. 5; *Woodberry*, 146 Fed.Appx. at 977; *Owens*, 79 Fed. Appx. at 161. Finally, the record does not reflect any treatment by Dr.

12

Sohail with respect to the right knee cap. *See* Sohail Decl. at ¶¶ 1-18; MDOC Medical Records (docket no. 47-2). Defendants are entitled to summary judgment on this claim.

### D. Intense and debilitating pain since 1994

While plaintiff alleged that he has suffered from intense and debilitating pain since 1994, his claims relate to treatment in 2008, 2009 or 2010.[2] Plaintiff provides only vague allegations regarding his lack of treatment for pain. Defendants have provided specific examples of their efforts to treat plaintiff.

In her declaration, PA Ouellette points out: that due to plaintiff's renal failure, "we were circumscribed regarding the types of medications that we could prescribe the patient"; that the medical providers were forced to discontinue Mobic and Naproxen due to the renal failure; that plaintiff refused two non-NSAID pain medications offered to him, i.e., Tagretol and Elavil; that every time plaintiff complained to her regarding pain she sought to resolve the source of the pain, such as by testing and treating plaintiff for a urinary tract infection; that she referred plaintiff to medical doctors for evaluation of his neck, knee and abdominal pain; and that she refilled his pain medications upon request. Ouellette Decl. at ¶ 80. Some examples of PA Ouellette's treatment and plaintiff's demands include the following: on January 2, 2009, upon complaint of chest pain, she ordered an x-ray of his ribs and an EKG to establish a baseline due to plaintiff's condition as a hypertensive diabetic; on March 6, 2009, she ordered a test to assess plaintiff's kidney functioning; on June 22, 2009, she saw plaintiff regarding urinary changes, numbness, chest pain, leg cramps and fatigue, noted that blood work showed that plaintiff' had poor diabetes control and that he was non-

---

[2] The court notes that based upon the filing date of October 13, 2010, any claims arising from 1994 through October 13, 2007 would be barred by the statute of limitations. *See Chippewa Trading Company v. Cox*, 365 F.3d 538, 543 (6th Cir. 2004) (the statute of limitations for a § 1983 claim is three years, based upon Michigan's three-year statute of limitations for injury to a person or property, M.C.L. § 600.5805(10)).

13

compliant with his diet (i.e., he admitted eating foods such as ice cream and pies); on July 22, 2009, plaintiff reported severe liver and right flank pain that started years ago, prompting Ouellette to order an x-ray of his abdomen (which showed minimal gas or fecal material in the colon and no evidence of abnormal masses or calcification); on September 9, 2009 plaintiff reported that he wanted to discontinue all medication; on September 19, 2009, plaintiff complained of numerous symptoms included chest pain; upon examination on September 19th, PA Ouellette noted that plaintiff had poor control of his diabetes, had refused various medications (Perantine, Glucotrol and Hytrin), which resulted in Ouellette scheduling him to see Dr. Gelabert; and on January 28, 2010, plaintiff informed Ouellette that he did not want her to examine him and that his lawyer was looking at his file. *See* Ouellette Decl. at ¶¶ 5, 10, 13, 15-16-18, 39.

Dr. Gelabert also treated plaintiff for reports of pain. Examples of Dr. Gelabert's treatment include the following: on October 5, 2009, the doctor evaluated plaintiff's chest pain at which time plaintiff requested a referral to a cardiologist; at that time, Dr. Gelabert ordered another EKG, ordered a chest x-ray to assess heart size, advised plaintiff to continue Naprosyn and Tylenol, and noted that plaintiff refused various medications (Glucotrol, Tylenol and Persantine); on September 13, 2010, the doctor addressed plaintiff's right knee pain, and while noting restrictions on medication due to plaintiff's renal failure, offered him Elavil for pain management, which plaintiff refused. Gelabert Aff. at ¶¶ 6, 8-9.

Dr. Sohail examined plaintiff for chest pain on May 17, 2010. Sohail Decl. at ¶ 5. At that time, plaintiff was lethargic, in mild distress, reported chronic constant chest pain and dizziness, looked chronically ill and slovenly, and had a fast and pounding heart rate. *Id.* Given plaintiff's significant health issues. Dr. Sohail was concerned that the chest pain constituted a

14

cardiac event and sent hm to an outside emergency room for further assessment. *Id.* Plaintiff was diagnosed with a urinary tract infection, for which Dr. Sohail prescribed an antibiotic. *Id.*[3]

This record, when viewed in the light most favorable to the non-moving party (plaintiff), reflects that plaintiff received constant attention from defendants for his reports of pain. Under these circumstances, plaintiff's claim does not rise to the level of deliberate indifference. *See Westlake*, 537 F.2d at 860 n. 5. Furthermore, while plaintiff complains about suffering from intense and debilitating pain, the record reflects that he was non-compliant in controlling his diabetes and refused medication on various occasions. "Disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment." *Wright v. Genovese*, 694 F.Supp.2d 137, 155 (N.D.N.Y. 2010). In this regard, a prisoner's non-compliance with the directions of the medical staff undermines conclusory claims that the medical staff was deliberately indifferent to the prisoner's serious medical needs. *Id.* at p. 157, *citing Jones v. Smith*, 784 F.2d 149, 151-52 (2nd Cir.1986) (plaintiff's history of declining treatment by prison doctors undermined his claim that they were deliberately indifferent in failing to treat his back issues). Accordingly, defendants are entitled to summary judgment with respect to plaintiff's claims that they were deliberately indifferent to his intense and debilitating pain.

### E. Defendants limited the use of a wheelchair

---

[3] Dr. Sohail's declaration and the attached medical records do not reflect other treatment of plaintiff prior to the filing of the complaint on October 13, 2010.

In his "Answer" to defendants' motion for summary judgment, plaintiff states that he "no longer claims liability with regard to the wheelchair accommodation." Answer at ¶ 2 (docket no. 55). Defendants are entitled to summary judgment with respect to this claim.

### III.    Plaintiff's motion to file a third amended complaint

Plaintiff commenced this action *pro se* and represented himself in this matter until September 2, 2011. On that date - nearly one month after the close of discovery and four days before the deadline for filing pre-trial motions - Attorney Shirley Burgoyne entered her appearance on behalf of plaintiff and moved for permission to file a third amended complaint. Shortly thereafter, defendants filed their motions for summary judgment based upon the allegations in the second amended complaint and discovery relevant to those claims. Those motions were fully briefed, with plaintiff's counsel filing two responses, which consisted of over 90 pages of arguments, affidavits and medical records. *See* Responses (docket nos. 55 and 57).

In the motion to file a third amended complaint, plaintiff's counsel seeks to add allegations, "mostly from Plaintiff's first Complaint, to plead the issues with clarity." The focus of the proposed third amended complaint is that in 1994, the MDOC arranged a consultation with the University of Michigan, Department of Neurosurgery, to address plaintiff's medical problems. At that time, University of Michigan physicians "recommended an anterior throat operation including fusion at the 4th and 5th disks, and removal of herniated disks and spurs." Proposed Third Amend. Compl. at ¶ 7 (docket no. 42-1). The proposed third amended complaint focuses on plaintiff's claim that defendants failed to perform the throat operation recommended back in 1994: on or about April 29, 2010, Dr. Sohail refused to request approval for the surgery; prior to that date, Dr. Gelabert refused to request approval for the surgery; and from October 29, 2008 through August

16

2010, PA Ouellette refused to request the surgery. The proposed third amended complaint also includes allegations that the medical providers refused to provide adequate pain treatment and made admissions against their interest regarding plaintiff's need for surgery, and that PA Ouellette "violently" refused plaintiff the surgery, "yelling and screaming" at plaintiff, throwing him out of her office, threatening to take his wheelchair away, and writing him tickets. *See* Proposed Third Amend. Compl. at ¶¶ 11a.-c.; 12a.-d., and 12a.-g. In summary, plaintiff's proposed third amended complaint raises the issue of plaintiff's evaluation from 1994 (which this court has addressed) and contains new allegations against PA Ouellette, Dr. Sohail and Dr. Gelabert.

Defendants oppose plaintiff's motion to file a third amended complaint on grounds of futility, prejudice, undue delay and lack of notice. Because this was originally a *pro se* prisoner case exempt from certain aspects of Fed. R. Civ. P. 26, the court did not enter its standard Rule 16 scheduling order setting forth deadlines for pleadings, discovery and motion practice. However, after defendants filed their answers, the court entered a case management order tailored to prisoner civil rights cases. *See* Case Management Order (docket no. 27). This order set forth deadlines for the completion of discovery, for the filing of pre-trial motions and a timeline for scheduling the trial. If the court granted plaintiff's motion, then it would require issuance of a completely new case management order, effectively taking the case back to the beginning. Defendants point out that a plaintiff needs to show "good cause" for failing to amend a complaint when the proposed amendment is so late that it would require modification of the scheduling order. *See Korn v. Paul Revere Life Insurance Company*, 382 Fed. Appx. 443, 449 (6th Cir. 2010) (while Rule 15(a)(2) requires the court to "freely give leave to amend" a complaint, a different standard applies when a proposed amendment is so late that it would require the modification of a Rule 16 scheduling order,

17

i.e., the movant must demonstrate "good cause" for his failure to move to amend at a time that would not have required modification of the scheduling order). Under these circumstances, the court concludes that the "good cause" standard for amending the complaint should apply. *See* Fed. R. Civ. P. 16(b)(4) ("[a] schedule may be modified only for good cause and with the judge's consent"). "[I]n addition to Rule 16's explicit 'good cause' requirement, we hold that a determination of the potential prejudice to the nonmovant also is required when a district court decides whether or not to amend a scheduling order." *Leary v. Daeschner*, 349 F.3d 888, 909 (6th Cir. 2003).

Under the circumstances of this case, the court concludes that plaintiff has not demonstrated good cause for filing a third amended complaint and that defendants will be prejudiced if the motion is granted. When plaintiff's counsel entered her appearance after the close of discovery and within days of the deadline for filing pre-trial motions, she should have anticipated that discovery was complete, the issues were settled, and that pre-trial proceedings were at an end. While plaintiff's counsel states that the purpose of the third amended complaint is to "add clarity" to the existing allegations, counsel also seeks to re-instate allegations from plaintiff's original complaint, a pleading which was improperly filed and resulted in court orders to file both an amended and second amended complaint. *See* Order to file amended complaint (docket no. 4) and Order to file second amended complaint (docket no. 7). If the court were to allow plaintiff to file the proposed third amended complaint, then the case management order would have to be amended to allow the parties to engage in discovery related to the new allegations. Defendants have no doubt spent a considerable amount of time and resources to reply to the rather open-ended allegations in plaintiff's second amended complaint; their motions for summary judgment, supporting briefs, reply briefs and attached exhibits total approximately 372 pages. *See* docket nos. 43, 45, 46, 47, 62.

Now, they will have to file an answer to the new allegations as set forth in the third amended complaint, re-open discovery with respect to these new claims and consider filing yet another round of dispositive motions. In the context of prisoner litigation, defendants will need to address whether plaintiff has properly exhausted any new claims as required under the Prison Litigation Reform Act. In summary, plaintiff has failed to show good cause for filing this late motion to amend his complaint and defendants will be prejudiced by having to expend their time and resources defending claims that could have been raised at the outset of this litigation.

Furthermore, the proposed amendment would be futile. The gist of plaintiff's claim in the third amended complaint is that defendants failed to address medical evaluations performed at the University of Michigan in 1994. The court has addressed this claim, reviewed plaintiff's treatment with defendants and concluded that defendants were not deliberately indifferent to plaintiff's medical needs. Plaintiff has failed to articulate how the allegations in the third amended complaint would lead to a different result on this claim. Plaintiff's motion to amend should be denied.

### IV. Recommendation

For the reasons set forth above, I respectfully recommend that plaintiff's motion to file a third amended complaint (docket no. 42) be **DENIED**.

I further recommend that the motions for summary judgment filed by defendants PA Ouellette and Dr. Gelabert (docket no. 43) and Dr. Sohail (docket no. 46) be **GRANTED** and that this action be **DISMISSED**.

Dated: August 21, 2012  /s/ Hugh W. Brenneman, Jr.
　　　　　　　　　　　　　　　　　　　　　　　HUGH W. BRENNEMAN, JR.
　　　　　　　　　　　　　　　　　　　　　　　United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report. All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).